UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                      :

RONNIE COLE,                            :

                    Plaintiff,       :

                             :               05 Civ. 2902 (GEL)

     -v.-                       :

                             :          **OPINION AND ORDER**

GLENN GOORD, et al.,          :

                             :

                  Defendants.     :

                             :
------------------------------------------------------------x

Ronnie Cole, Rome, NY, pro se.

Andrew M. Cuomo, Attorney General of the State
of New York, New York, NY, by John E. Knudsen,
Assistant Attorney General, for defendants.


GERARD E. LYNCH, District Judge:

      Plaintiff Ronnie Cole, a New York State prisoner, brings this action alleging that

defendants Glenn Goord, Brian Fischer, Lester N. Wright, John Perilli, Eileen Hansen, Gail

Haponik, Frederick Bernstein, and Donald Stevens, officials of the New York State Department

of Correctional Services ("DOCS"), denied him reasonable accommodations for his disabilities

in violation of the Americans with Disabilities Act ("ADA").  Defendants have moved for

summary judgment, arguing that Cole was provided with reasonable accommodations in

accordance with the ADA and that, even if Cole could demonstrate an ADA violation,

defendants are immune from suit under the ADA.  For the reasons stated below, their motion

will be granted in part and denied in part.

**BACKGROUND**

Based on the evidence in the record, taken in the light most favorable to the plaintiff, a reasonable factfinder could find the following facts.

Ronnie Cole is an inmate in the custody of DOCS.  From January 2004 to July 2005, he was housed at Sing Sing Correctional Facility ("Sing Sing").  In July 2005, Cole was transferred to the Green Haven Correctional Facility ("Green Haven"), where he remained until January 2006.  (Def. Rule 56.1 Statement, ¶ 2.)  He is currently housed at the Walsh Regional Medical Facility.  Defendants were all employees of the New York State DOCS at the time relevant to the complaint.[1]

**I.      Cole's Medical Conditions**

    A.      <u>Hearing</u>

Cole has been diagnosed as having non-significant bilateral hearing loss.  (Def. Rule 56.1 Statement, ¶ 8.)  An audiologist Cole saw at Sing Sing prescribed hearing aids, which Cole wears on a daily basis and which enable Cole to hear clearly.  (<u>Id</u>.; Deposition of Ronnie Cole, dated March 20, 2008 ("Cole Dep."), 35-36.)  The audiologist noted that Cole responded "reliably and consistently to everyday speed, normal hearing conversation."  (Supplemental Declaration of John Knudsen, dated January 16, 2009 ("Knudsen Suppl. Decl."), Ex. B at ¶ 3.)

---

[1] According to Cole's Amended Complaint, Glenn Goord was the Commissioner of the New York State DOCS, Brian Fischer was Superintendent of Sing Sing, Lester Wright was Chief Medical Examiner at DOCS, John Perilli was the Health Services Director at Sing Sing, Eileen Hansen was a Nurse Administrator at Sing Sing, Gail Haponik was an Acting Superintendent at Green Haven, Frederick Bernstein was Health Care Director at Green Haven, and Donald Stevens was a Nurse Administrator at Green Haven.  The Amended Complaint does not specify how each of these defendants personally violated his rights under the ADA.

B.      Walking

Cole walks with the assistance of canes and leg braces.  (Am. Compl. 3.)  With the canes and braces, Cole is able to walk on flat surfaces.  (Id; Declaration of John Knudsen, dated September 22, 2008 ("Knudsen Decl."), Ex. B at ¶ 4.)  According to Dr. Perrilli, the Facility Health Services Director at Sing Sing who examined Cole numerous times, Cole is "fully ambulatory" with the leg braces and cane.  (Id.; see also Cole Dep. 50-51, 53.)  Cole asserts, however, that it is painful and difficult for him to negotiate stairs.  (See Cole Dep. 53; Opp'n 2.)

C.      Incontinence and Urinary Problems

As a result of a botched surgical procedure, Cole asserts that his urinary tract and groin are "in a state of disruption," requiring Cole to self-catheterize six times a day and wear adult diapers, and subjecting him to frequent infections.  (Am. Compl. 3-4.)

II.     **Sing Sing and Green Haven**

On December 17, 2004, after being housed at Sing Sing for nearly a year, Cole filed a grievance, complaining that he was being denied reasonable accommodations in violation of the ADA.  Cole's grievance asserted that he needed closed captioning on the television screens, guard rails in the showers, and a handicap-accessible ramp to the commissary.  (Knudsen Decl., Ex. D at COLE 878.)  Dr. Perilli responded that Cole was fully ambulatory when using his leg braces and cane, that his hearing deficit had been corrected with hearing aids, and that he had been given a medical pass allowing numerous accommodations.[2]  (Id. at COLE 871.)  On appeal, the grievance was denied by the Central Office Review Committee for the reasons noted in Dr.

_____

[2]  These accommodations included bus use, elevator use, canes, ground floor accommodations, a daily shower, indoor recreation, metal knee braces, and an air cushion donut. (Knudsen Decl., Ex. D at COLE 352.)

3

Perilli's response, and also because Cole had not made a formal request for reasonable accommodations.

On May 17, 2005, Cole formally requested accommodations including a sign language interpreter, closed-captioned television, preferred seating, a telephone amplifier, hearing aids, and a guard rail in the shower.  (Id. at COLE 350.)  Dr. Perilli reviewed the requests, and approved only the one for hearing aids.  (Id.)  Dr. Perilli noted that Cole had been examined by an audiologist who had found that, apart from hearing aids, no further accommodations were needed for Cole's non-significant bilateral hearing loss, and that Sing Sing had already provided Cole with a special shower seat which served the same purpose as a guard rail.  (Id. at COLE 351; see also Cole Dep. 67.)

On June 3, 2005, Cole appealed the denial of his request for reasonable accommodations and asked that, "if Sing Sing Corr. Fac. Cannot make Reasonable Accommodations for my medical condition, [] I be transferred to a facility that can and will meet [my] needs."  (Knudsen Suppl. Decl., Ex. B at COLE 926.)

On July 27, 2005, Cole was transferred to Green Haven, a facility which was specifically designed in collaboration with legal and medical representatives of disabled inmates to accommodate inmates with wheelchairs and walking disabilities.  (Knudsen Decl., Ex. A at ¶ 3.)  Cole's transfer memo stated that he was being transferred for medical reasons because he needed an "accessible flat facility."  (Knudsen Suppl. Decl., Ex. B, COLE 923.)  Cole alleges that, as at Sing Sing, his disabilities were not reasonably accommodated at Green Haven.  Cole also claims that Green Haven staff retaliated against him for filing grievance complaints by denying him daily showers and access to his medical supplies.  (Opp'n 8.)

Cole first filed a complaint with this Court on March 16, 2005, seeking injunctive relief under the ADA in conjunction with the conditions of his confinement at Sing Sing. After being transferred to Green Haven, Cole filed an amended complaint on August 17, 2005, seeking injunctive relief concerning conditions at Green Haven, and damages against Sing Sing and Green Haven officials.[3]

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment must be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

When a party is proceeding pro se, a judge must assess his pleadings by a more generous standard than that accorded to pleadings drafted by lawyers. Bussa v. Alitalia Linee Aeree Italiane, S.P.A., No. 02 Civ. 10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004). Despite this more lenient treatment, a pro se litigant must still meet the normal requirements to survive a

---

[3] The operative pleading in this case, the amended complaint dated August 17, 2005, is technically Cole's second amended complaint.

motion for summary judgment.  Id. at *11.  See also Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995),  reh'g granted on other grounds, 914 F. Supp. 1004 (S.D.N.Y. 1996) (holding that a "pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (internal quotations omitted).

## II.    Title II of the ADA

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The Supreme Court has held that Title II of the ADA applies to state prisoners.  Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-10 (1998).

To establish an ADA violation, an inmate must demonstrate that (1) he is a qualified individual with a disability; (2) he is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his disability; and (3) the defendants are subject to the ADA.  Allah v. Goord, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005).

Before evaluating the merits of Cole's Title II claims, this Court must determine whether under the ADA Cole is able to sue the defendants he has named.

### A.    Individual Capacity Suits

Cole's pleadings do not specify whether he has named the defendants in their individual or official capacities.  Because it is well established that Title II does not authorize suits against state officers in their individual capacities, see, e.g., Browdy v. Karpe, 131 Fed. Appx. 751, 754 (2d Cir. 2005); Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001), Cole's claims are dismissed to the extent that he seeks to sue them in that manner.

B.    Official Capacity Suits for Injunctive Relief

Cole can proceed with a suit against the defendants in their official capacity for

injunctive relief pursuant to Ex parte Young, 209 U.S. 123, 155-56 (1908).  See, e.g., Henrietta

D. v. Bloomberg, 331 F.3d 261, 287-88 (2d Cir. 2003).  However, Cole's claims are directed

against conditions he experienced at Sing Sing and Green Haven even though he has since been

transferred to a different facility.  Since "[i]t is settled in this Circuit that a transfer from a prison

facility moots an action for injunctive relief against the transferring facility," Prins v. Coughlin,

76 F.3d 504, 506 (2d Cir. 1996); Young v. Coughlin, 866 F.2d 567, 568, n.1 (2d Cir. 1989),

Cole's claims for injunctive relief are moot.

C.    Official Capacity Suits for Money Damages

Less amenable to a tidy answer is the issue of whether a plaintiff may sue a state officer

in his or her official capacity for money damages.[4]  Defendants first contend that no individual

can be an appropriate defendant in a Title II action for money damages.  Title II of the ADA

provides that "no qualified individual with a disability shall . . . be excluded from participation in

or be denied the benefits of the services, programs, or activities of a *public entity*, or be subjected

to discrimination by any such *entity*."  42 U.S.C. § 12132 (emphasis added).  The phrase "public

entity" is defined by the ADA to include "any State or local government" and "any department,

agency, . . . or other instrumentality of a State."  42 U.S.C. § 12131(1)(B).  Defendants argue

that because the plain language of Title II permits suits only against "public entities," it therefore

---

[4] It is beyond question, however, that if money damages are recoverable, they are limited
to compensatory damages.  Punitive damages are not recoverable under the ADA.  Barnes v.
Gorman, 536 U.S. 181, 189-90 (2002) ("Because punitive damages may not be awarded in
private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be
awarded in suits brought under § 202 of the ADA.")  Accordingly, all of Cole's claims for
punitive damages must be dismissed.

7

precludes any suits against individuals, even those named in their official capacities.

A number of courts within this circuit have come to the same conclusion. See, e.g., Carrasquillo v. City of New York, 324 F. Supp. 2d 428, 441 (S.D.N.Y. 2004) ("Individuals cannot be named as defendants in ADA suits in either their official or representative capacities."); Hallett v. New York State Dep't of Corr. Servs., 109 F. Supp. 2d 190, 199-200 (S.D.N.Y. 2000) (dismissing ADA claims asserted against individual defendants because Title II provides disabled individuals redress for discrimination by a public entity, which, as it is defined in the statute, does not include individuals); Candelaria v. Cunningham, No. 98 Civ. 6273, 2000 WL 798636, at *2 (S.D.N.Y. June 20, 2000) (finding no individual liability for prison officials under Title II of the ADA); Nucifora v. Bridgeport Bd. of Educ., No. 3:99 Civ. 00079, 2000 WL 887650, at *2 (D. Conn. May 23, 2000) (dismissing Title II claims against individuals in light of "overwhelming authority prohibiting individual liability under the ADA"); Lee v. State of New York Dep't of Corr. Servs., No. 97 Civ. 7112, 1999 WL 673339, at *13 n. 14 (S.D.N.Y. Aug. 30, 1999) (dismissing Title II claims against corrections officers for "lack of individual liability under the ADA").

The Second Circuit, however, reasoned in Henrietta D. that an individual sued in his or her official capacity under the doctrine of Ex parte Young is effectively a "public entity" subject to liability under the ADA since the real party in interest in an official-capacity suit is the government entity. 331 F.3d at 288. Although Henrietta D. concerned a suit for injunctive relief, some courts in this circuit have interpreted Henrietta D. to mean that the language of Title II does not in itself preclude an individual defendant from being sued for damages in his or her official capacity. See, e.g., Charles v. New York State Dept. of Corr. Servs., No. 9:07 Civ. 1274, 2009 WL 890548, at *4 (N.D.N.Y. March 31, 2009). Courts in this district have also interpreted

8

the Second Circuit's <u>Garcia</u> opinion as condoning suits against individuals in their official

capacities. 280 F.3d at 107. <u>See</u>, <u>e.g.</u>, <u>Degrafinreid v. Ricks</u>, 417 F. Supp. 2d 403, 411

(S.D.N.Y. 2006) ("[In <u>Garcia</u>,] only the individual capacity claims were dismissed as

unauthorized by statute; both the official capacity claims and those against the state agency were

addressed under the Eleventh Amendment.").

 This Court finds the reasoning adopted by the <u>Charles</u> and <u>Degrafinreid</u> courts

persuasive.  Regardless of the specific remedy at issue in <u>Henrietta D.</u>, the reasoning of the Court

in that case applies to suits for money damages as well as to suits for injunctive relief.  As the

Court of Appeals held:

> The real party in interest in an official-capacity suit is the
> government entity.  <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991). As
> a result, it is irrelevant whether the ADA would impose individual
> liability on the officer sued; since the suit is in effect against the
> "public entity," it falls within the express authorization of the
> ADA.

331 F.3d at 288.  The very idea of a suit against an officer in his official capacity is that the suit

addresses the office – a "public entity" – not the officer personally.  Cole's claims for money

damages will not therefore be dismissed on the grounds that he has named only individual

defendants rather than expressly suing a "public entity."[5]

 But the determination that Cole is permitted to name individual defendants in a suit for

money damages under Title II only leads to a different obstacle: the State's sovereign immunity

---

 [5] Even if defendants were correct that they cannot be sued by name in any capacity, the
point would be of little moment.  Any error on the part of the pro se plaintiff in suing the
individual officer rather than the entity for which he is responsible would be purely nominal
rather than substantive, and could be cured by permitting the plaintiff to amend his complaint to
name the State itself or a state agency.  Since the named defendants are not sued as individuals,
they cannot be held to answer personally for any damages awarded, and thus they have no
individual stake in the matter.

from suit under the Eleventh Amendment.  For the very reason that "official capacity" suits may be brought under Title II – because the suit is in reality one against the State itself – the Eleventh Amendment is implicated.

Although the text of the Eleventh Amendment is more limited, see Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 247-302 (1985) (Brennan, J., dissenting); U.S. Const. amend. XI, the Amendment has long been held to prohibit a citizen of a State from suing a State or its agencies in federal court.  See Hans v. Louisiana, 134 U.S. 1 (1890).  The State's sovereign immunity also extends to damage actions against state employees acting in their official capacities, because the State is the real party in interest in such actions.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-99 (1984).

Congress may, however, abrogate a State's sovereign immunity.  See Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996).  To do so, Congress must (1) make "its intention to abrogate unmistakably clear in the language of the statute" and (2) act "pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment."  Nevada Dept. of Human Res. v. Hibbs, 538 U.S. 721, 726 (2003).  As to the first requirement, Congress has explicitly stated an intent under Title II to abrogate the States' sovereign immunity.  See 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.").

As to the second requirement, Congressional abrogation of a State's sovereign immunity is a "valid exercise of power under § 5 of the Fourteenth Amendment" when the legislation in question "enforce[s] the substantive guarantees of that Amendment."  Tennessee v. Lane, 541 U.S. 509, 518 (2004).  In seeking to enforce the substantive guarantees of the Fourteenth

10

Amendment, Congress may enact prophylactic measures which prohibit conduct that does not actually violate the Constitution, id. at 529, but the measures may not work "a substantive change in the governing law."  City of Boerne v. Flores, 521 U.S. 507, 519 (1997).  In order to determine whether legislation exceeds Congress's power under § 5, courts apply the three-part "congruence and proportionality" test first established in Boerne, id. at 520.  In applying this test, a court must: (1) identify "with some precision the scope of the constitutional right at issue," Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 365 (2001); (2) determine whether Congress identified a history and pattern of unconstitutional conduct by the States, and (3) if so, analyze whether the statute is an appropriate, congruent, and proportional response to that history and pattern of unconstitutional treatment.  Id. at 374; Boerne, 521 U.S. at 520.

In Garcia, the Second Circuit determined that, under the Boerne test, Title II of the ADA was not a congruent and proportional response to the problem of discrimination against the disabled and therefore was not within the ambit of Congress's authority under § 5.  280 F.3d at 110-11.  The Garcia court also held, however, that Title II monetary claims against the states would comport with Congress's § 5 authority so long as the plaintiff could establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability.  Id. at 111.  The Second Circuit reasoned that "[g]overnment actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment – i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest."  Id.

In 2004, the Supreme Court held in Tennessee v. Lane that Title II of the ADA constituted a valid exercise of Congress's § 5 power – at least in the context of cases implicating the fundamental right of access to courts.  541 U.S. 509 (2004).  In assessing whether Title II

was an appropriate response to the "history and pattern of unequal treatment" which Congress

found had been directed at the disabled, the Supreme Court clarified the scope of the congruent

and proportional inquiry, noting that

> nothing in our case law requires us to consider Title II, with its
> wide variety of applications, as an undifferentiated whole.
> Whatever might be said about Title II's other applications, the
> question presented in this case is not whether Congress can validly
> subject the States to private suits for money damages for failing to
> provide reasonable access to hockey rinks, or even to voting
> booths, but whether Congress had the power under § 5 to enforce
> the constitutional right of access to the courts.  Because we find
> that Title II unquestionably is valid § 5 legislation as it applies to
> the class of cases implicating the accessibility of judicial services,
> we need go no further.

Id. at 530-31.

Two years after Lane, the Supreme Court decided United States v. Georgia, which

broadened Lane to hold that "insofar as Title II creates a private cause of action for damages

against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly

abrogates state sovereign immunity."  546 U.S. 151, 159 (2006) (emphasis in original).  But the

Court did not reach the issue of whether Title II validly abrogates state sovereign immunity for

conduct that violates Title II but not the Fourteenth Amendment.  Instead, the Supreme Court

held that lower courts should determine, on a case-by-case basis, (1) which aspects of the State's

alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth

Amendment; and (3) insofar as such misconduct violated Title II but did not violate the

Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to

that class of conduct is nevertheless valid.  Id.  The Georgia Court thus "expressly left open the

possibility that misconduct that does not violate a fundamental right protected by the Fourteenth

Amendment could nevertheless violate Title II and lead to a valid private cause of action for

money damages against a state." Olson v. State of New York, No. 2:04 Civ. 00419, 2007 WL 1029021, at *7 (E.D.N.Y. March 30, 2007).

In the absence of a ruling from the Second Circuit, district courts in this Circuit have come to different conclusions as to whether Garcia is still good law in light of Lane and Georgia. See, e.g., Goonewardena v. New York, 475 F. Supp. 2d 310, 323 n.2 (S.D.N.Y. 2007) ("It is far from clear whether the discriminatory animus requirement remains in place following the Supreme Court's decisions in Lane and Georgia."); Olson, 2007 WL 1029021, at *7 ("The Second Circuit, moreover, has yet to address the fate of Garcia in the wake of Lane and Georgia, even though district courts in this Circuit have adopted divergent positions as to whether Garcia has been abrogated.").[6]

Defendants, taking the narrowest view of the circumstances in which Title II suits may constitutionally be brought against the State, argue that Cole's suit is barred by the Eleventh Amendment, even if the evidence would support a finding that Title II was violated. For purposes of this motion, however, it is unnecessary to delve into these deep constitutional waters. For the most part, Cole's claims must be dismissed because they fail to make out a violation of Title II in the first place. The one claim that survives does so because the record is too undeveloped to reject it as a matter of law, even if Cole were required to prove discriminatory animus.

_____

[6] In Brown v. DeFrank, No. 06 Civ. 2235, 2006 WL 3313821 (S.D.N.Y. Nov. 15, 2006) the court grafted the Garcia test onto the Georgia ruling to find that "[a] damage claim under the ADA against a state (or state agency or official) that covers conduct that violates the Fourteenth Amendment is not barred by the Eleventh Amendment as long as the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." Id. at *26 (internal citations omitted). In Goonewardena, however, the court applied the test laid out in Georgia without adding a discriminatory animus requirement to its abrogation analysis. See 475 F. Supp. 2d at 323.

### III.   Cole's Claims Under Title II

As noted above, to establish an ADA violation, an inmate must demonstrate that (1) he is a qualified individual with a disability; (2) he is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his disability; and (3) the defendants are subject to the ADA.  Allah, 405 F. Supp. 2d at 274.

The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C.A. § 12102(A).  A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C.A. § 12131(2).

Defendants do not explicitly contest that Cole is a qualified individual with a disability under the ADA, and as held above, to the extent that they are sued in their official capacities, they in effect constitute a public entity subject to the ADA.  Defendants claim, however, that Cole received reasonable accommodations for his disabilities and thus was not denied the ability to participate in or otherwise benefit from the programs offered by Sing Sing and Green Haven on the basis of his disabilities.

### A.   Reasonable Accommodation Standard

The regulations promulgated by the Department of Justice to implement Title II direct public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the

service, program or activity."  28 C.F.R. § 35.130(b)(7) (2005).

Addressing the standards for reasonable accommodation under Title II, the Supreme

Court wrote that

> [t]he remedy Congress chose is nevertheless a limited one.
> Recognizing that failure to accommodate persons with disabilities
> will often have the same practical effect as outright exclusion,
> Congress required the States to take reasonable measures to
> remove architectural and other barriers to accessibility.  But Title
> II does not require States to employ any and all means to make
> judicial services accessible to persons with disabilities, and it does
> not require States to compromise their essential eligibility criteria
> for public programs.  It requires only "reasonable modifications"
> that would not fundamentally alter the nature of the service
> provided, and only when the individual seeking modification is
> otherwise eligible for the service.  As Title II's implementing
> regulations make clear, the reasonable modification requirement
> can be satisfied in a number of ways. . . . [I]n no event is the entity
> required to undertake measures that would impose an undue
> financial or administrative burden, threaten historic preservation
> interests, or effect a fundamental alteration in the nature of the
> service.

Lane, 541 U.S. at 531-32 (internal citations omitted).  The Second Circuit has further noted that

whether or not something constitutes a reasonable accommodation is a fact-specific inquiry, and

that determinations on the issue must accordingly be made on a case-by-case basis.  Wernick v.

Fed. Reserve Bank of New York, 91 F.3d 379, 385 (2d Cir. 1996).

B.      The Standard Applied to Cole's Claims

1.      Closed Captioning on Television Screens

Cole claims that he was prevented from watching movies shown to the general

population in the auditorium because defendants failed to use English-language closed

captioning.  (Opp'n 2-3.)  At Sing Sing, Cole claims that the closed captioning was enabled but

that the subtitles shown were in Spanish, for the benefit of the Spanish-speaking inmates.  At

Green Haven, Cole asserts that the closed captioning feature was not used at all.  Defendants argue that they satisfied their obligations to reasonably accommodate Cole's hearing problems under the ADA by providing him with hearing aids which enabled him to hear clearly.  (Mem. 8.)

Defendants are correct that, as long as they reasonably accommodated Cole's disability, they need not provide him with the exact accommodations he demanded.  See Wernick, 91 F.3d at 384-85.  This Court need not, however, decide whether the hearing aids alone constituted a reasonable accommodation because, for purposes of the ADA, Cole does not have a hearing disability.  Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him.  (See Def. Rule 56.1 Statement, ¶ 8. )  But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA.[7]  With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[] up everything."  (Cole Dep. 36.)[8]  Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999); see also Fall v. New York State United Teachers, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or

---

[7] Non-significant hearing loss – Cole's condition – is not considered a disability by the New York State DOCS.  (Knudsen Decl., Ex. D at COLE 667-68.)  Defendants assert that if DOCS had considered Cole to have significant hearing loss, Cole would have been housed at a facility designated accessible to inmates with that disability.  (Id. 668-69; see also Mem. 8.)

[8] While it is clear that Cole's hearing loss does not rise to the level of a disability with the use of hearing aids, it is far from clear that his difficulties would constitute a disability even if the hearing aids were not – as under the law they must be – taken into account.  His hearing loss was diagnosed as "non-significant," and Cole was able to conduct his entire deposition without wearing his hearing aids.  (Cole Dep. 35.)

support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

Accordingly, because no reasonable factfinder could find that Cole is disabled with respect to his hearing, as a matter of law he has failed to establish that Title II requires any accommodation beyond the hearing aids already provided to him by defendants.

    2.  Inaccessible Areas

With respect to Sing Sing, Cole asserts that he was not able to access the mailbox and the law library because they were on the second and third floor respectively of buildings without elevators.[9]  (Opp'n 3.)  Cole also claims that the commissary and the auditorium, where movies were shown and where some Muslim services were held, were not sufficiently equipped with wheelchair-accessible ramps.[10]  (Id. 2-4, 10-11.)

Title II "does not require States to employ any and all means to make . . . services accessible to persons with disabilities."  Lane, 541 U.S. at 531-32.  The statutory language prohibits excluding disabled individuals from participation in "the benefits of services, programs or activities"; it does not require that every portion of a prison or other facility be easily accessible to individuals with handicaps.  The Supreme Court has explained that, "in the case of older facilities, for which structural change is likely to be more difficult, a public entity may

---

[9] There is some dispute as to exactly how difficult it was for Cole to negotiate stairs. Cole maintains that stairs pose him "extreme difficulty" and cause "increased pain."  (Opp'n 2.) Sing Sing's medical staff found, however, that he was "fully ambulatory" with his braces and canes (Knudsen Decl., Ex. B at ¶ 4), and that he "walks slowly up stairs but [staff] have observed him walking up and down stairs quite well."  (Opp'n, Ex. E at COLE 830.)  On a motion for summary judgment, the Court may not resolve this conflict, but takes the evidence in the light most favorable to Cole.

[10] The commissary apparently was serviced by a handicapped ramp at its entrance but there were stairs within the commissary itself.  (Opp'n 3.)

comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." Id. at 531-32 (internal citations omitted).

The record establishes that DOCS met these standards at Sing Sing. Although the mailbox was on the second floor, Cole does not allege that he was unable to send mail, e.g., by handing letters to a fellow inmate or a member of Sing Sing's staff to place in the box for him. Similarly, although Cole complains that the auditorium was not serviced by a handicapped ramp, he also complains about the lack of closed captioning on the movies that were shown *in the auditorium*, thus implicitly acknowledging that he was in fact able to access the auditorium – even if it perhaps with difficulty. (Opp'n 2, 4.) And while some parts of the commissary were only accessible by stairs, Cole asserts not that he was unable to use the commissary but rather that Sing Sing should have provided wheeled carts or someone to help him carry his purchases back to his cell. (Opp'n 3.) As to the law library, Cole admits that he was able to get law books brought to him, and that Sing Sing officials sent a law clerk to assist him in his cell. (Cole Dep. 58.) Thus, the record reflects that Cole was not excluded from the benefits of inconveniently located services.[11]

But even assuming that Cole was unable to fully participate in certain programs or services due to their structural inaccessability, Sing Sing responded with an entirely reasonable accommodation by transferring him to a facility that was specifically designed for inmates with

---

[11] The record also reflects that Sing Sing provided Cole with numerous accommodations for his walking disability. Cole was given an elevator pass, allowed to use a bus that would take him to other parts of the facility, including the visiting room and the yard, was placed on the ground level housing of the facility, allowed use of indoor recreation, and was given the option of eating in his cell. (Knudsen Decl., Ex. B at ¶ 4; Cole Dep. 59.)

difficulty walking.[12]  Cole had no right to remain at any particular facility within DOCS.  See

Montanye v. Haymes, 427 U.S. 236, 242-43 (1976) (under New York State law, inmates have

"no right to remain at any particular prison facility . . . . [A]dult persons sentenced to

imprisonment are not sentenced to particular institutions, but are committed to the custody of the

Commissioner of Corrections. . . .  Thereafter, the Commissioner is empowered by statute to

transfer inmates from one correctional facility to another." (internal citations omitted)); see also

Garrett v. Angelone, 940 F. Supp. 933, 942 (W.D. Va. 1996), aff'd, 107 F.3d 865 (4th Cir. 1997)

(holding that neither the Equal Protection Clause nor the ADA create any right for an inmate to

be housed at a specific prison).  Furthermore, to comply with the ADA, "the States are required

to operate their public programs so that those programs, '*when viewed in [their] entirety*,' are

accessible to and usable by disabled citizens . . . [T]hey are not necessarily required to 'make

each of [their] existing facilities accessible to and usable by individuals with disabilities.'"

---

[12] Cole claims that he was transferred from Sing Sing to Green Haven in retaliation for
his complaints.  Prison officials may not retaliate against prisoners for exercising their
constitutional right to file lawsuits and grievances seeking administrative redress.  Colon v.
Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).  An inmate alleging retaliation bears the burden of
showing that the conduct at issue was constitutionally protected and that the alleged wrongful
action would not have been taken but for the exercise of his constitutional rights.  Burgess v.
Goord, No. 98 Civ. 2077, 1999 WL 33458, at *7-8 (S.D.N.Y. Jan. 26, 1999).  Action that is
taken for both valid and invalid reasons will not be deemed unconstitutional if the action would
have been taken in any event for the constitutionally valid reason.  Id. at *8.  Given the ease of
fabrication, it is important for courts to "examine prisoners' claims of retaliation with skepticism
and particular care."  Id. (quoting Colon, 58 F.3d at 872).

In this case, Cole himself *asked* to be transferred to another facility that could better
accommodate him if Sing Sing was unable to make the accommodations he sought.  (Knudsen
Suppl. Decl., Ex B at COLE 925-26) ("I ask that if Sing Sing Corr. Fac. Can not make
reasonable accommodations for my medical condition, that I be transferred to a facility that can
and will meet my needs.")  Cole offers no argument or evidence that granting his request for a
transfer to a facility specifically designed to handle inmates with walking disabilities was
retaliatory, other than his conclusory assertions that all actions taken against him are in
retaliation for his complaints.

Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 489 (4th Cir. 2005) (quoting 28 C.F.R. § 35.150(a)).  Cole therefore has failed to present evidence that would permit a reasonable factfinder to conclude that his Title II rights with respect to the accessibility of various of the prison's programs and services were violated at Sing Sing.

With respect to Green Haven, Cole claims not that any area was entirely inaccessible to him but that he was prevented from attending Muslim services because he was denied access to an elevator that would take him to the room where services took place.  (Opp'n 8.)  In his deposition, however, Cole conceded that Green Haven had actually given him an elevator pass, that he did in fact sometimes attend the Muslim services, and that part of the reason he claimed that these services were "inaccessible" to him was that he often did not feel like waiting for the required escort to accompany him there and back.  (Cole Dep. 63-64.)  On these facts, Cole has not made out a colorable Title II violation against the Green Haven defendant on this claim.

3.      Daily Showers and Access to Medical Supplies

Cole asserts that he was denied the daily medical showers which he required to prevent infections caused by his incontinence.  (Opp'n 4-5.)  Defendants respond that, at Sing Sing, Cole had a pass allowing him three showers per day and, at Green Haven, he had a pass for a daily shower.  (Cole Dep. 80, 81.)  Cole claims that, despite his pass, he did not in fact receive his daily showers while at Green Haven.  (Id. at 81.)  Cole submitted numerous grievances at Green Haven complaining that he was not getting his daily shower (see Declaration of Ronnie Cole, dated December 10, 2008 ("Cole Decl."), Ex B at 79, 82), but the record also includes a letter dated October 5, 2005, from Cole to the Superintendent of Green Haven referring to the fact that he showered daily at 1pm.  (Knudsen Decl., Ex. D at COLE 330.)

20

Cole also asserts that his incontinence requires diapers and other medical supplies on a regular basis and that, at Green Haven, defendants would not allow him to go to the medical department to pick up his daily medical supplies.[13]  (Opp'n 8.)  The record includes a medical pass Cole was issued at Green Haven entitling him to receive his medical supplies (including six diapers, two catheters, and other supplies) on a daily basis.  (Knudsen Decl., Ex. E at COLE 800.)

Assuming the truth of Cole's allegations that officials at Green Haven did not always give him the treatment and supplies he needed for his incontinence, however, these assertions raise a claim for medical neglect rather than one that sounds under the ADA.[14]  Cole does not

_____

[13] Cole contends that he was denied his daily shower and his medical supplies in retaliation for his having filed grievance complaints.  (Opp'n 8.)  While Cole's conduct was constitutionally protected, Colon, 58 F.3d at 872, Cole's conclusory assertions of retaliatory conduct do not create a genuine issue as to whether his protected conduct was a substantial motivating factor in the prison officials' alleged behavior.  See Burgess, 1999 WL 33458, at *7-8.

[14] In his response to defendants' motion (though not in his complaint), Cole argues that these failures to provide medical care at Green Haven constitute  "deliberate indifference to [his] serious medical needs," Estelle v. Gamble, 429 U.S. 97, 103 (1976), in violation of the Eighth Amendment.  (Opp'n 5-A.)  To state a constitutional claim based on the denial of medical care, a plaintiff must satisfy both an objective and a subjective component.  To determine whether a plaintiff has satisfied the objective component, courts have taken into account both the seriousness of the plaintiff's medical condition, Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), and the severity of the alleged deprivation of appropriate care, Wilson v. Seiter, 501 U.S. 294, 298 (1991); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  The subjective prong requires that the prison official accused have acted with a sufficiently culpable state of mind.  Wilson, 501 U.S. at 297-98.  To be sufficiently culpable, the defendant must act with deliberate indifference.  That is, he must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Perhaps because his Eighth Amendment argument was something of an afterthought, Cole has not presented evidence that any of the named defendants were personally responsible for any failure to deliver his supplies.  Nor does he provide any evidence from which a reasonable factfinder could conclude that these failures were the product of deliberate disregard

assert that he was excluded from any prison service or program because he was not issued medical supplies or a daily shower.  Accordingly, Cole fails to state a violation under Title II with respect to this claim.  See Carrasquillo, 324 F. Supp. 2d at 443.

4.      Guard Rails in the Shower

Cole requested guard rails in the showers at Sing Sing and Green Haven as an accommodation for his walking disability.  Neither facility installed the guard rails; instead, each provided Cole with a chair for him to use in the shower.  (Cole Dep. 67.)[15]  Defendants assert that these shower chairs constituted reasonable accommodation of Cole's disability.  (Mem. 11.) At Sing Sing, Cole claims he was given a plastic shower chair that he would "slide off of." (Cole Dep. 67; see also Affirmation of Ronnie Cole, dated November 13, 2008 ("Cole 11/13/08 Affirm."), at 3.)  At Green Haven, Cole asserts that he was given a steel office chair that "had no back on it," and was "broke[n]" in some unspecified way.  (Cole Dep. 67.)

While these accommodations may have been less than ideal, Cole does not claim that he was prevented from taking showers by the lack of guard rails nor that he was injured using either of the chairs provided.  Accordingly, Cole has not presented evidence indicating that the failure to provide guard rails in all of the facility showers denied him access to "the benefits of services, programs or activities" at either institution.

---

of Cole's admittedly serious medical problems.  The Court rejected similar claims with respect to Cole's treatment at Sing Sing in a separate Eighth Amendment lawsuit brought by Cole.  See Cole v. Goord, 04 Civ. 8906, 2009 WL 1181295, at *8 (S.D.N.Y. Apr. 30, 2009).

[15] Cole concedes that there *were* guard rails in some of the showers he used at Green Haven, but claims that the rails were rusted and corroded.  (Cole Dep. 26, 66.)

5.   <u>Employment</u>

Cole asserts that he was excluded from employment programs at both Sing Sing and Green Haven as a result of his disability.  Cole claims that Sing Sing refused to provide him with suitable employment, instead placing him on "medically unassigned status."  (Opp'n 5.)  Cole concedes, however, that Sing Sing did eventually offer him employment, first as a porter, and then as a "Gym Recreation official/Clerk Sports Official."  He complains, however, that this employment was unsuitable because he has never "been big on sport[s]."  (Affirmation of Ronnie Cole, dated December 12, 2008 ("Cole 12/10/08 Affirm.") at ¶ 24).  He further contends that, once he was transferred to Green Haven, he was again denied an employment opportunity.  (Opp'n 8.)

Though Cole's complaint clearly asserts an exclusion from employment opportunities ("[t]he conduct complained about in this action involves: (a): failure to employ . . . leaving plaintiff medically unassigned" (Am. Compl. 4); "Plaintiff seeks to be provided with meaningful employment" (<u>id</u>. 6.)), defendants' initial brief entirely ignores this claim, and their sole response to it is the assertion, in a footnote in their reply brief, that Cole "refute[s] himself when he states that Sing Sing gave him a porter position, and then a position as a gym recreation official."  (Def. R. Br. 7 n. 7.)  Defendants do not address how the employment programs at Sing Sing and Green Haven were constituted, including such questions as to what extent they were remunerative or rehabilitative and to what extent jobs were generally made available to every inmate.  Nor do they identify what types of jobs were available at either institution, or the extent to which Cole's various medical problems made him unsuited to any occupation.  Given defendants' failure even to address the employment claims in their initial motion papers, it is not clear that defendants have properly moved for summary judgment on those claims at all; it is

23

certainly clear that their initial motion papers fail to demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

With respect to his Sing Sing claims, Cole has no colorable ADA claim for being given a job he was not "big on."  Reading his affirmation with the liberality properly accorded to pro se declarations, however, it is possible that Cole is arguing not that he was given a job he didn't like, but rather that he was not really assigned the jobs that defendants assert he was given.  Thus, he repeatedly attests that only "*after* plaintiff file[d] his Civil Complaint did defendant(s) at Sing Sing Correctional try to cover up th[eir] wrong by adding the plaintiff[] on the Gym Rec[re]ation pay roll as a Clerk/Sports Official."  (Opp'n 8 (emphasis added); see also Cole 12/10/08 Affirm. ¶ 25 ("[A]fter the plaintiff file[d] a Civil Complaint, the defendant[s] at Sing Sing Correctional Facility tr[ied] to cover up [their] action[s] by adding the plaintiff's name as a porter, [then] later over to Gym Rec[re]ation official/Clerk Sports Official even though plaintiff [is] not nor [has] ever been big on sport[s].")  In other words, Cole's testimony does not "refute himself" with respect to whether he was given employment before the complaint was filed, and there appears to be a factual issue as to whether he ever actually was assigned a job, rather than simply being falsely listed as having one.

With respect to his Green Haven claims, the record is somewhat different.  Cole asserts that he was deemed "medically unassigned" at Green Haven (Cole 12/10/08 Affirm. ¶ 15), and he provides a document verifying that he was classified as "medically unemployed" by Green Haven's medical department.  (Cole Decl., Ex. A at COLE 129.)  This document notes that Cole's medical condition restricts him from squatting, pushing, pulling or running, and may not lift more than 30 pounds, but finds that he is unrestricted as to temperature range, has no

24

significant hearing or vision impairment, and is capable of standing, bending, and walking.

This document may well represent a professional medical assessment that Cole *should be* "medically unemployed" in light of his physical condition and the nature of the employment available at Green Haven. It is impossible, however, to reach this conclusion as a matter of law on the record before the Court. Cole himself asserts that he is capable of performing certain jobs "such as typing, filing, or even a teacher's aid position . . . or a clerk." (Opp'n 5.) And the evidence would support an inference that at Sing Sing he was assigned to duties as a porter or sports official (though the record, as noted, is unclear as to whether he ever actually performed those jobs). It is certainly not self-evident from Cole's history or from the limitations listed on the medical form that he is unable to perform sedentary work. Without a fuller record as to the meaning of the form, the nature of the jobs available, and what was done to determine whether Cole was fit for any of those jobs, it is impossible to tell what the "medically unemployed" notation represents, or whether it is based on a rational assessment of his capacity to work.

In light of Cole's many medical complaints and limitations, a reasonable factfinder might well conclude that while at Sing Sing and Green Haven he was not "qualified" (within the meaning of Title II of the ADA) to participate in DOCS employment programs. But it cannot be said on this record that no rational factfinder could conclude otherwise.

## IV.   Constitutional Issues

It is both unnecessary and impractical for the Court to decide on the present record whether the Eleventh Amendment precludes Cole's claims. As noted above, courts in this circuit are divided as to the proper test for determining whether Title II's purported abrogation of Eleventh Amendment immunity is effective. At a minimum, it is agreed that suit may only proceed against a State (or against state officials in their official capacity) if the plaintiff can

25

establish that the conduct of which he complains violates the Fourteenth Amendment as well as the statute.  Courts disagree about whether the plaintiff must also show, as required by <u>Garcia</u> before the Supreme Court's decisions in <u>Lane</u> and <u>Georgia</u>, that the actions complained of resulted from discriminatory animus.

On this record, however, defendants have failed to show that they are entitled to summary judgment under either standard.  A factfinder at trial may well conclude that the alleged failure to provide Cole with employment violated neither Title II nor the Constitution. There is some evidence, noted above, that medical personnel at Green Haven found Cole medically unfit for employment; if this is so, and the determination was a reasonable one, then Cole was not qualified for participation in the program from which he was excluded (thus precluding a violation of Title II), and his exclusion would be rationally related to a legitimate state interest (thus passing the test under the Equal Protection Clause for the constitutionality of governmental distinctions drawn on the basis of disability).  <u>City of Cleburne, Texas v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985).

But that cannot be said conclusively on this underdeveloped record.  Without further factfinding, it is not clear that Cole was unsuited for any employment.  If he was denied employment not because he was medically unfit for any job available at Green Haven, but simply because of casual stereotyping based on his physical impairments, his exclusion from the program would not be rational.  Cole has at least raised an issue of fact as to whether he is qualified to perform various sedentary jobs, based on his own account of his capacities, the medical form showing that he can adequately perform a number of physical functions that are compatible with light or sedentary work, and the alleged fact that he was eventually assigned work at Sing Sing.  To the extent that discriminatory animus is required, given the inadequacy of

defendants' showing with respect to the reasons for Cole's exclusion, it cannot be said that no reasonable juror could draw such an inference from the present record.

Accordingly, further factfinding will be required with respect to the overlapping issues of violation of Title II, violation of the Constitution, and discriminatory animus before the Court can determine whether there was any violation of Title II at all, and if so, whether liability may attach to state officials in their official capacity consistent with the Eleventh Amendment.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied with respect to Cole's claims for compensatory damages against defendants in their official capacity for failure to provide him with employment, and granted in all other respects.

SO ORDERED.

Dated: New York, New York
       August 25, 2009

GERARD E. LYNCH
United States District Judge